CHRIS K. RIDDER
CA State Bar Number: 218691 (*pro hac vice* pending;
will comply with LR IA 10-2 within 45 days)
Email: chris@rcjlawgroup.com
RIDDER, COSTA & JOHNSTONE LLP
California State Bar No. 218691
12 Geary Street, Suite 701
San Francisco, California 94108
Telephone: (415) 391-3311
Facsimile: (415) 358-4975

CHAD BOWERS
Email: bowers@lawyer.com
CHAD A. BOWERS, LTD
Nevada State Bar No. 7283
3202 West Charleston Boulevard
Las Vegas, Nevada 89102
Telephone: (702) 457-1001

Attorneys for Defendant and Counterclaimant AZKAR
CHOUDHRY, and Defendant and PAK.ORG.

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| RIGHTHAVEN LLC, a Nevada limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>AZKAR CHOUDHRY, an individual; and PAK.ORG, a corporation of unknown origin and nature,<br><br>        Defendants.<br>_____<br><br>AZKAR CHOUDHRY, an individual,<br><br>    Counterclaimant,<br><br>    v.<br><br>RIGHTHAVEN LLC, a Nevada limited liability company,<br><br>        Counter-defendant. | Case No. 2:10-cv-02155-JCM-PAL<br><br>**DEFENDANTS' AND COUNTERCLAIMANT'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................................... 2

    A.  The Parties ....................................................................................................... 2

        1.  Mr. Choudhry And Pak.Org ................................................................ 2

        2.  Righthaven, LLC ................................................................................. 4

    B.  The Alleged Infringement ............................................................................... 5

III. LEGAL STANDARD ................................................................................................. 6

    A.  Motion To Dismiss .......................................................................................... 6

    B.  Motion For Judgment On The Pleadings ......................................................... 6

    C.  Summary Judgment ......................................................................................... 7

IV. PLAINTIFF HAS NOT PROPERLY ALLEGED, AND CANNOT ALLEGE, A
    VIOLATION OF ANY RIGHT PROTECTED BY THE COPYRIGHT ACT ................. 8

    A.  Ninth Circuit Precedent Explicitly Precludes Direct Copyright Liability
        For Inline Linking To Copyrighted Material. ......................................................... 8

    B.  The HTML Source Code Is Incorporated By Reference Into Righthaven's
        Complaint ....................................................................................................... 10

V.  PLAINTIFF HAS NOT ALLEGED, AND CANNOT ALLEGE, A
    VOLITIONAL ACT, WHICH IS A PREREQUISITE TO A CLAIM FOR
    DIRECT COPYRIGHT INFRINGEMENT ..................................................... 11

VI. IT WOULD BE FUTILE FOR RIGHTHAVEN TO ATTEMPT TO AMEND ITS
    COMPLAINT .......................................................................................................... 15

VII. THE COMPLAINT SHOULD BE DISMISSED BECAUSE, AS A MATTER OF
    LAW, THE USE ALLEGED IS A FAIR USE ................................................... 17

    A.  The Purpose And Character Of The Use ....................................................... 17

    B.  The Nature Of The Work ............................................................................... 19

    C.  Amount And Substantiality Of The Portion Used ......................................... 22

    D.  Effect On The Market For Or Value Of The Copyrighted Work ................... 23

VIII. RIGHTHAVEN'S DEMAND FOR DOMAIN NAME TRANSFER SHOULD
    BE DISMISSED ..................................................................................................... 25

    A.  The Copyright Act Does Not Authorize Domain Name Transfer. ................ 26

B.    Rule 65 Prohibits The Court From Ordering A Non-Party To Transfer The Domain...............................................................................................27

C.    An Order Transferring The Domain To Righthaven Would Violate Mr. Choudhry's First Amendment Right To Free Speech...........................................28

IX.    CONCLUSION.............................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Am. Geophysical Union v. Texaco, Inc.*,
60 F.3d 913 (2d Cir. 1994) .......................................................................19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................7

*Anderson v. Stallone*,
1989 U.S. Dist. LEXIS 11109 (C.D. Cal. April 26, 1989) ....................20

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ..................................................................22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007). ...............................................................................6,

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ........................................................17, 19, 22

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006) ....................................................................17

*Bd. Of Educ. V. Pico*,
457 U.S. 853 (1982) .................................................................................29

*Bobolas v. Does 1-100*,
No. CV-10-2056-PHX-DGC,
2010 U.S. Dist. LEXIS 110856 (D. Ariz. Oct. 1, 2010) ........................27

*Branch v. Tunnell*,
14 F.3d 449, 454 (9th Cir. 1994) .............................................................10

*Budget Cinema, Inc. v. Watertower Associates*,
81 F.3d 729 (7th Cir. 1996) .....................................................................26

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......................................................................17- 19, 22

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ..............................................................11, 14

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986) ...........................................................................7

*Chase Nat'l Bank v. Norwalk,*
   291 U.S. 431 (1934) ..................................................................27

*CoStar Group, Inc. v. LoopNet, Inc.,*
   373 F.3d 544 (4th Cir. 2004) .............................................11, 13, 14

*Ctr. For Democracy & Tech v. Pappert,*
   337 F. Supp. 2d 606 (E.D. Pa 2004) ..........................................29

*Diario El Pais, S.L. v. Nielsen Co., (US),*
   No. 07-CV-11295(HB), 2008 U.S. Dist. LEXIS 92987 (S.D.N.Y. Nov. 6, 2008) ................12

*Entm't Research Group v. Genesis Creative Group,*
   122 F.3d 1211 (9th Cir. 1997) ................................................20

*Ets-Hokin v. Skyy Spirits,*
   225 F.3d 1068 (2000) .............................................................21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991) ..............................................................21

*Field v. Google Inc.,*
   412 F. Supp. 2d 1106 (D. Nev. 2006) ...............................11, 13, 24

*Gabrielson v. Montgomery Ward & Co.,*
   785 F.2d 762 (9th Cir.1986) ..................................................16

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,*
   896 F.2d 1542 (9th Cir. 1990). .................................................7

*Harper & Row, Publrs. v. Nation Enters.,*
   471 U.S. 539 (1985) ..............................................................19

*Io Group, Inc. v. Veoh Networks, Inc.,*
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) .....................................27

*Jackson v. Bank of Hawaii,*
   902 F.2d 1385 (9th Cir. 1990) .................................................7

*Jefferson Cty. Sch. Dist. v. Moody's Investor's Servs.,*
   175 F.3d 848 (10th Cir. 1999) ...............................................28

*Johnson v. American Airlines, Inc.,*
   834 F.2d 721 (9th Cir. 1987) .................................................16

*Kelly v. Arriba Soft Corp.,*
   336 F.3d 811 (9th Cir. 2003) ........................................17, 22- 24

*Knievel v. ESPN,*
    393 F.3d 1068, 1076 (9th Cir. 2005) ...................................................................10

*L.A. News Serv. v. CBS Broad. Inc.,*
    305 F.3d 924, 940 (9th Cir. 2002) ......................................................................20

*Landsberg v. Scrabble Crossword Game Players, Inc.,*
    736 F.2d 485 (1984) ............................................................................................21

*Marobie-Fl., Inc. v. Nat'l. Ass'n of Fire Equip. Distribs.,*
    983 F. Supp. 1167 (N.D. Ill. 1997) ....................................................................13

*Mattel v. Walking Mountain,*
    353 F.3d 792, 805 (9th Cir. 2003) ......................................................................24

*Mazer v. Stein,*
    347 U.S. 201 (1954) .......................................................................................20, 21

*Med. Mut. Ins. Co. of Maine v. Indian Harbor Ins. Co.,*
    583 F.3d 57 (1st Cir. 2009) .................................................................................27

*Mulberry Thai Silks, Inc. v. K&K Neckwear, Inc.,*
    897 F. Supp. 789 (S.D.N.Y. 1995) .....................................................................26

*National Union Fire Ins. Co. v. Argonaut Ins. Co.,*
    701 F.2d 95 (9th Cir. 1983) ..................................................................................7

*New.Net, Inc. v. Lavasoft,*
    356 F.Supp.2d 1090 (C.D. Cal. 2004) ..................................................................7

*Nintendo of Am., Inc. v. Aeropower, Co.,*
    34 F.3d 246 (4th Cir. 1994) ................................................................................26

*Nuñez v. Caribbean Int'l News Corp.,*
    235 F.3d 18 (1st Cir. 2000) ...........................................................................19, 22

*Parker v. Google, Inc.,*
    422 F. Supp. 2d 492 (E.D. Pa. 2006) ..............................................................13,

*Parrino v. FHP, Inc.,*
    146 F.3d 699 (9th Cir. 1998) ...............................................................................10

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007) ....................................................................*passim*

*Perfect 10, Inv. V. Visa Int'l Serv. Ass'n,*
    494 F.3d 788 (9th Cir. 2007) ..........................................................................15, 16

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*,
   662 F.2d 641 (9th Cir. 1981) ...............................................................................7

*Regal Knitwear Co. v. NLRB*,
   324 U.S. 9 (1945) ...............................................................................27

*Religious Tech. Ctr. v. Lerma*,
   897 F. Supp. 260 (E.D. Va. 1995) ...............................................................29, 30

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) ...............................................11, 13, 14, 29

*Reno v. Aclu*,
   521 U.S. 844 (1997) ...............................................................................28

*Righthaven v. Center for Intercultural Organizing*,
   Case No. 2:10-cv-01322-JCM-LRL ...............................................................................4

*Righthaven LLC v. DiBiase*,
   Case No. 2:10-cv-01434-RLH-PAL ...............................................................................27

*Righthaven LLC v. Realty One Group, Inc.*,
   Case No. 10-1036-LRH-PAL,
   2010 U.S. Dist. LEXIS 111576 (D. Nev. Oct. 19, 2010) ...............................24, 25

*R.J. Gorman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*,
   335 F.3d 643, 647 (7th Cir. 2003) ...............................................................................7

*Roth v. Garcia Marquez*,
   942 F.2d 617 (9th Cir. 1991) ...............................................................................16, 17

*Scott v. Donald*,
   165 U.S. 107 (1897) ...............................................................................27

*Sega Enters. Ltd. v. Maphia*,
   948 F. Supp. 923 (N.D. Cal. 1996) ...............................................................14, 15

*Sobhani v. @radical.media, Inc.*,
   257 F. Supp. 2d 1234 (C.D. Cal. 2003) ...............................................................................20

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ...............................................................18, 19, 24, 26

*Taubman Co. v. Webfeats*,
   319 F.3d 770 (6th Cir. 2003) ...............................................................................28

*Ticketmaster Corp. v. Tickets.com, Inc.*,
   54 U.S.P.Q.2D (BNA) 1344, 2000 U.S. Dist. LEXIS 4553 (C.D. Cal. Mar. 27, 2000) ...........8

*Tory v. Cochran*,
  544 U.S. 734 (2005) ..............................................................29

*U.S. v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ...............................................10

*Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ..............................................................28

*Video-Cinema Films, Inc. v. CNN, Inc.*,
  2001 U.S. Dist. Lexis 25687 (S.D.N.Y. Nov. 28, 2001) ........24

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) .........................................22, 23

*Yakama Indian Nation v. Wash. Dept. of Revenue*,
  176 F. 3d 1241 (9th Cir. 1999) ..........................................6, 16

**STATUTES**

17 U.S.C. § 102(b) ...................................................................20

17 U.S.C. § 106 .........................................................................8

17 U.S.C. § 107(4) ...................................................................23

17 U.S.C. § 501 .......................................................................26

17 U.S.C. § 502 .......................................................................26

**RULES**

Fed. R. Civ. P. 12(b)(6) ....................................................*passim*

Fed. R. Civ. P. 12(c) ........................................................*passim*

Fed. R. Civ. P. 56(c) ................................................................ 7

Fed. R. Civ. P. 56(e) ............................................................ 7, 27

Fed. R. Civ. P. 65(d)(2) ........................................................... 27

**OTHER MATERIALS**

URS GASSER, *REGULATING SEARCH ENGINES: TAKING STOCK AND LOOKING AHEAD*, 8 YALE J. L. & TECH. 201 (2006)...................................... 12

H.R. REP. NO. 105-551(I) (1998) ................................................ 14

**MOTION**

Pursuant to Fed. R. Civ. P. 12(b)(6) – and, in the alternative, Fed. R. Civ. P. 12(c) and Fed. R. Civ. P. 56 – Azkar Choudhry and Pak.Org (collectively, "Mr. Choudhry") hereby and respectfully move to dismiss with prejudice, or in the alternative for judgment on the pleadings or summary judgment, Righthaven LLC's ("Righthaven") sole cause of action for copyright infringement, and its improper request for transfer of the paklinks.com domain (the "Domain"). This motion is supported by the Memorandum of Points and Authorities, the Declaration of Mr. Azkar Choudhry (the "Choudhry Decl."), and the Declaration of Mr. Benjamin A. Costa (the "Costa Decl.") submitted concurrently herewith, and any oral argument the Court may allow.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Righthaven alleges that Mr. Choudhry infringed its copyright in an informational graphic concerning a solar "death ray" created by the Sun's reflection off the Vdara Hotel at CityCenter on the Strip (the "Infographic"). [Pl.'s Compl., Ex. 1]. This lawsuit represents yet another example of Righthaven's questionable business model – to sue first and ask questions later. Had Righthaven discharged its obligation to conduct even a basic pre-suit investigation, it would have quickly perceived – at a minimum – that the Infographic at issue appeared on Mr. Choudhry's web site by virtue of an "inline link," – a line of computer code used in internet web pages to direct a user's browser program to a third-party site to retrieve an image directly from that third-party site. Righthaven's lawsuit is fatally flawed because (i) inline linking of images does not infringe copyright as a matter of law, (ii) Mr. Choudhry engaged in no volitional act related to the allegedly infringing forum post, and (iii) any "use" Mr. Choudhry is purported to have made of the Infographic was a protected fair use of that work.

Righthaven's request for transfer of the Domain must similarly fail because: (1) plaintiffs in copyright litigation are entitled only to those remedies authorized by the Copyright Act, which does not authorize domain transfer as a remedy for copyright infringement; (2) the Court has no authority to order a third party not present in this case to effect the transfer; and (3) divesting Mr. Choudhry of his domain name in response to a single post, on a web site with nearly 8 million

posts, would violate Mr. Choudhry's right to free speech pursuant to the First Amendment to the U.S. Constitution.

In terms of procedure, this Court has three options for quick disposal of this case. First, the Court may dismiss the Complaint under Fed. R. Civ. P. 12(b)(6), as the allegations of the Complaint are insufficient to state a claim for relief. Alternatively, should the Court somehow find those allegations sufficient, Defendant notes that he has filed his Answer and Counterclaims, providing the Court with additional pleadings that provide support for dismissal under Fed. R. Civ. P. 12(c). Finally, should the Court need to move beyond the pleadings, Defendant has provided additional evidence and argument in this motion demonstrating that no issues of material fact can reasonably be disputed, and that no reasonable jury could find for the Plaintiff.

## II.    FACTUAL BACKGROUND

### A.    The Parties

#### 1.    Mr. Choudhry And Pak.Org

Mr. Choudhry is the long-time owner and operator of the paklinks.com and pak.org domains, both of which direct users to Mr. Choudhry's web site, GupShup. [Choudhry Decl. ¶¶ 2, 3]. GupShup is an Urdu[1] word meaning "gossip" or "casual talk." [Id. ¶ 4]. Mr. Choudhry's web site is a forum for like-minded community members to engage in discussions about a wide variety of interest areas, including travel, world affairs, philosophy, parenting, health, relationships, computer technology, business and fashion. [Id. ¶ 6].[2]

Mr. Choudhry began operating GupShup from his home in Houston, Texas in 1994 [Id. ¶ 7], gradually added web-based forums as the World Wide Web became more popular, and transitioned the site to its current forum-centered format in 1998. [Id. ¶ 8] GupShup is a very popular site. [Id. ¶¶ 9-12]. Today, GupShup has over 7.8 million posts across its diverse range of topic areas. [Id. ¶ 10]. In an average month, it receives more than 2 million page views from

---

[1] Urdu is a language commonly spoken in both Pakistan and India. [Choudhry Decl. ¶ 5].

[2] Righthaven has named "Pak.org" as a defendant; however Pak.org is not distinct from Mr. Choudhry as an individual. [Choudhry Decl. ¶ 46]. Accordingly, to the extent the instant motion does not resolve the entire case, Pak.org should be dismissed as an improper defendant.

1   almost half a million unique visits from dozens of different countries. [Id. ¶ 11]. GupShup is a

2   place where users from all over the world can come together and share their views: nearly forty

3   percent of its users are from Pakistan and India, 18% of users originate from the U.S., and the

4   remaining come to GupShup from many other countries around the globe. [Id. ¶ 12].

5        Mr. Choudhry does not operate GupShup as a profit-making enterprise. Rather, he

6   operates the site as a labor of love, and as a service to the hundreds of thousands of users each

7   month who come to the site to engage in "casual talk" with each other. [Id. ¶ 13]. After hosting

8   fees and other operating expenses, GupShup approximately broke even in 2009 and 2010. In

9   prior years, GupShup has generally cost Mr. Choudhry more money than it has earned. [*Id*].

10       Users do not come to Mr. Choudhry's site to view copyrighted content; they come to talk

11  to each other. As a service to its users, GupShup subscribes to a small number of RSS feeds[3] that

12  are relevant to particular forum categories, and posts the content from those feeds in discrete sub-

13  forums. [Id. ¶¶ 14, 15]. Out of 82 separate forum categories, 8 include a sub-forum with RSS

14  feeds. [Id. ¶ 16]. The RSS feed sub-forums get relatively little traffic – as little as 0.28% of site

15  traffic on any given day is attributable to RSS feed sub-forums – and they have little or no

16  posting activity. [Id. ¶ 17]. Mr. Choudhry estimates that monthly revenue from all of the RSS

17  forums combined amounts to less than $5.00. [Id. ¶ 18]. The post at issue in this case was viewed

18  89 times by an estimated 30 unique users, amounting to no more than a few pennies in

19  advertising revenue being attributable to the individual post. [Id. ¶ 19].

20       Until he learned about the instant suit, Mr. Choudhry had never been sued by any content

21  owner regarding even a single purported instance of copyright infringement. [Id. ¶ 20]. Mr.

22  Choudhry does not operate a newspaper, or distribute content via any printed medium. [Id. ¶ 21].

23  Before learning of the instant suit, Mr. Choudhry had never heard of the Las Vegas Review-

24  Journal or of Plaintiff Righthaven. [Id. ¶ 22].

25       Mr. Choudhry did not learn of this case via letter or phone call from Righthaven. [Id.

26  ¶ 23]. Rather, he learned about the case when Steve Green, a reporter for the Las Vegas Sun,

27  _____

    [3] RSS, described in more detail below, is an automated service that enables third party web sites

28  to provide automated content updates to subscribers.

1   reviewed the Court's docket and called Mr. Choudhry on December 12 for comment on the

2   lawsuit. [Id. ¶ 24]. Immediately after he learned from Mr. Green that a copyright owner was

3   concerned about a post on GupShup – and before even being served with the Complaint – Mr.

4   Choudhry removed the post from public view. [Id. ¶¶ 25, 28].

5                    **2.      Righthaven, LLC**

6          Plaintiff Righthaven is a "copyright troll" whose sole purpose is to bring copyright

7   infringement lawsuits based on works that it allegedly acquires rights in, solely for the purpose

8   of bringing such suits. [Costa Decl., Ex. A. (Righthaven's "only job is to protect copyrighted

9   content.")]. Although it is staffed by lawyers, run as a law firm, and sues people for copyright

10  infringement of its clients' newspaper articles, it is incorporated as an LLC and bills itself as a

11  "technology company." [Id]. Righthaven does not produce copyrighted content, nor does it

12  operate a newspaper, or distribute copyrighted content via print or via any other means. [Id.,

13  Ex. B].

14         Righthaven's business model apparently revolves around soliciting copyright

15  assignments from third party newspapers – including Stephens Media LLC ("Stephens Media"),

16  the publisher of the Las Vegas Review-Journal (the "LVRJ") – solely and exclusively for the

17  purpose of encouraging and bringing copyright infringement lawsuits regarding the contents of

18  those solicited assignments. [Pl.'s Compl., Ex. 3 (showing a copyright registration based on such

19  an assignment); Costa Decl., Exs. B, C, and D (describing Righthaven's business model)]. But

20  for the piece of paper Righthaven attaches to its complaints, it appears to make no use

21  whatsoever of the copyrights it "purchases," and the LVRJ makes no change in how it handles

22  the articles it "assigns" to Righthaven. [Costa Decl., Ex. E (Infographic still freely available

23  without advertising)]. For example, the article at issue in this case is still published on the

24  LVRJ's web site, alongside the LVRJ's advertisements, and still purports to be "© Las Vegas

25  Review-Journal." [Pl.'s Compl., Ex. 1]. When Righthaven was asked by this Court whether it

26  formally licenses its purported copyrights back to the LVRJ, Righthaven's counsel, Mr.

27  Mangano, refused to provide an answer. *See Righthaven v. Center for Intercultural Organizing*,

28  Case No. 2:10-cv-01322-JCM-LRL, Dkt 27.

1  Righthaven has filed over 200 copyright infringement lawsuits since its formation in

2  early 2010. [Costa Decl., Ex. F]. Many of the targets of these suits appear to be individuals and

3  non-profit organizations that lack the economic resources to defend themselves against

4  Righthaven's claims. [Id]. Righthaven misuses the threat of statutory damages, the potential loss

5  of a defendant's domain name, and the prospect of mounting attorney's fees to extract quick

6  settlements from terrified defendants based on claims related to works owing to which

7  Righthaven suffers no economic harm. Given that Righthaven appears willing to settle matters

8  for "less than five figures" [Id., Ex. H], it makes no economic sense for defendants to resist –

9  even if they have valid defenses. Mr. Choudhry has chosen to resist as a matter of principle, and

10  because as a matter of law he is simply not liable for copyright infringement.

11  **B.      The Alleged Infringement**

12  On or about September 25, 2010, the LVRJ published a news article entitled, *Vdara*

13  *visitor: 'Death ray' scorched hair*. [Pl.'s Compl., Ex. 1 ( available free of charge at

14  http://www.lvrj.com/news/vdara-visitor---death-ray--scorched-hair-103777559.html)]. The

15  article concerns the Vdara Hotel at CityCenter in Las Vegas, which has the peculiar quality of

16  reflecting sunlight into a 10-foot by 15-foot area hot enough to melt plastic cups and bags, and

17  even to burn human hair. [Id.]. The article was accompanied by three images – two photographs

18  and the Infographic, the latter of which illustrates the angle and characteristic of the solar

19  convergence. Righthaven's complaint is based solely on Mr. Choudhry's alleged use of the

20  Infographic. [Pl.'s Compl. ¶ 11].

21  On or about October 7, 2010, the Make Magazine blog ("Make"),

22  http://blog.makezine.com, published a post entitled *Can a Building Be a Sun-Death Ray? Yes!*

23  [Costa Decl., Ex. I].[4] Make's post included the Infographic, a link to an article in Wired

24  Magazine about the optical and mathematical properties of curved buildings, a link to the LVRJ

25  article, and a photograph from a prior issue of Make Magazine depicting a home-made Solar

26

---

[4] Make is a magazine, web site, and community focused on DIY projects and how-tos that help

27  its readers make the most of technology. *See* http://makezine.com/about/ ("MAKE Magazine

brings the do-it-yourself mindset to all the technology in your life.")

28

1  Death Ray. [Id.] The purpose of Make's post was to juxtapose the Vdara death ray with the

2  homemade death ray, along with Wired's instructions on the optical properties of solar death

3  rays, so users could learn about an exciting optical phenomenon, and perhaps build one (or, if

4  necessary, avoid building one) of their own. As it typically does with its blog posts, Make made

5  its October 7, 2010 post available via its RSS feed: a feed to which the GupShup web site

6  subscribed.[5]

7      On October 8, 2010, due to the automated operation of GupShup's vBulletin

8  (http://www.vbulletin.com) software, the Make post automatically appeared in one of GupShup's

9  sub-forums ("RSS:Gadgets"). [Choudhry Decl. ¶¶ 29, 31]. At no time did the GupShup post

10  include a copy of the Infographic; it merely linked to that image at its location on Make's

11  servers. [Id. ¶¶ 29, 32, 33].

12  **III.   LEGAL STANDARD**

13      **A.   Motion To Dismiss**

14      Pursuant to Rule 12(b)(6), the court will dismiss complaints that "fail to state a claim

15  upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While the court must accept as true

16  all well-pleaded factual allegations contained in a complaint, a plaintiff is required to provide

17  "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

18  will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While leave to amend is

19  often granted where deficiencies in a complaint are easily remedied, such leave should not be

20  granted where amendment would be futile. *Yakama Indian Nation v. Wash. Dept. of Revenue*,

21  176 F. 3d 1241, 1248 (9th Cir. 1999).

22      **B.   Motion For Judgment On The Pleadings**

23      Pursuant to Rule 12(c), a party may move for judgment on the pleadings at any time after

24  the pleadings are closed but within such time as not to delay the trial. *See* Fed. R. Civ. P. 12(c).

25  Judgment on the pleadings is proper when the moving party establishes on the face of the

26  pleadings that no material issue of fact remains unresolved and that it is entitled to judgment as a

27

28  [5] RSS technology is discussed in detail in Section V, below.

1    matter of law. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550

2    (9th Cir. 1990). When brought by the defendant, Rule 12(c) is a "means to challenge the

3    sufficiency of the complaint after an answer has been filed" and is treated similarly to a motion

4    to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090,

5    1115 (C.D. Cal. 2004); *see also*, *R.J. Gorman Derailment Services, LLC v. International Union*

6    *of Operating Engineers, Local Union 150*, *AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003) (12(c)

7    motion uses same standard that applies to dismissals under Fed. R. Civ. P. 12(b)(6) for failure to

8    state a claim on which relief can be granted).

9         **C.    Summary Judgment**

10        When a court must consider evidence beyond the pleadings a motion to dismiss is

11   properly treated as one for summary judgment. *Portland Retail Druggists Ass'n v. Kaiser Found.*

12   *Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981). Summary judgment should be granted if there is

13   no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

14   Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving

15   party has met its initial burden, a party wishing to defeat summary judgment must present

16   specific facts that demonstrate a genuine issue of material fact. Fed. R. Civ. P. 56(e); *Celotex*,

17   477 U.S. at 323-324. Material facts are those that may affect the outcome of the case; a genuine

18   dispute exists only if there is sufficient evidence for a reasonable jury to return a verdict for the

19   nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere

20   disagreement about a material issue of fact is not in itself sufficient to preclude an award of

21   summary judgment. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1389 (9th Cir. 1990).

22        If the non-moving party cannot "elicit material evidence through further discovery,

23   summary judgment is appropriate." *Id.* (citing *Klingele v. Eikenberry*, 849 F.2d 409, 412 (9th

24   Cir. 1988))."Neither a desire to cross-examine an affiant nor an unspecified hope of undermining

25   his or her credibility suffices to avert summary judgment." *National Union Fire Ins. Co. v.*

26   *Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (*citing Soar v. National Football League*

27   *Players' Association*, 550 F.2d 1287, 1289 n.4 (1st Cir. 1977)).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.   PLAINTIFF HAS NOT PROPERLY ALLEGED, AND CANNOT ALLEGE, A VIOLATION OF ANY RIGHT PROTECTED BY THE COPYRIGHT ACT**

   **A.   Ninth Circuit Precedent Explicitly Precludes Direct Copyright Liability For Inline Linking To Copyrighted Material.**

It is well settled that – as a matter of law – linking does not constitute direct copyright infringement.[6] *See, e.g., Ticketmaster Corp. v. Tickets.com, Inc*., 54 U.S.P.Q.2D (BNA) 1344, 2000 U.S. Dist. LEXIS 4553, at *6 (C.D. Cal. Mar. 27, 2000) (allegation of infringement in a complaint that is based on a linking theory "does not allege copying" because ". . . hyperlinking does not itself involve a violation of the Copyright Act . . . no copying is involved."). Inline linking is no different.

Direct copyright infringement only occurs when the defendant engages in an act listed in Section 106 of the Copyright Act. *See* 17 U.S.C. § 106. This can include the direct reproduction, distribution, or display of a copyrighted image; however, inline linking does not reproduce, distribute, or display copyrighted material. Rather than providing an image directly to an end user, inline linking directs the web browsers of its users to load content (in this case, the Infographic) from a third party source (in this case, Make Magazine). Thus, it is the third party that is reproducing, distributing, or displaying any allegedly infringing image, not the provider of the inline link.

This is exactly the conclusion drawn by the Ninth Circuit in a case directly on point, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160-1161 (9th Cir. 2007). In that case, Perfect 10 argued that Google infringed the copyright in Perfect 10's photographs by "displaying" full-size versions of those photographs to end users through its Image Search service. Specifically, it alleged that, after users entered a search in Google's Image Search, Google presented the results as "thumbnail" versions of images that acted as hyperlinks to the full-size versions. When users clicked these thumbnails, rather than sending users directly to the page containing the full-size image, Google presented the full-size image in a "frame," as an

---

[6] Linking could theoretically be subject to allegations of secondary liability, which Righthaven has not alleged. For the reasons explained below, and in Section VI, any allegation of secondary liability would be futile.

1  inline link. [7] The Ninth Circuit described the process of inline linking, in pertinent part, as

2  follows:

3      When a user clicks on a thumbnail image, the user's browser program interprets

4      HTML instructions on Google's webpage. . . . [which] give the user's browser the
    address of the website publisher's computer that stores the full-size version of the

5      thumbnail. Google does not store the images . . . and does not communicate the
    images to the user; Google simply provides HTML instructions directing a user's

6      browser to access a third-party website. . . . Thus, the user's window appears to be
    filled with a single integrated presentation of the full-size image, but it is actually

7      an image from a third-party website.

8      *Id.* at 1155-1156. Based on this finding, the Ninth Circuit held as a matter of law that

9  inline linking could not directly infringe any of Perfect 10's copyrights. *Id.* at 1160.

10      Just as in *Perfect 10 v. Amazon*, although the GupShup forum post at issue may appear at

11  first glance as if the image is displayed by the GupShup server, it is not. As the source code for

12  the post makes clear, GupShup does nothing more than provide a link that the end-user's browser

13  loads and displays "inline" from the Make web site. [Choudhry Decl., ¶¶ 29, 32-36; Ex. A at line

14  811]. Line 811 of the source code contains the image tag for the Infographic that Righthaven has

15  accused Mr. Choudhry of infringing:

16      "<img src="http://blog.makezine.com/_images_4822896-4-4.jpg" border="0"

17      alt="" onload="NcodeImageResizer.createOn(this);" />"

18      [Id. ¶¶ 34-36; Ex. A at line 811]. This is technologically identical to the inline linking

19  Google used in *Perfect 10 v. Amazon*. Accordingly, in light of the source code to Exhibit 2 of

20  Righthaven's Complaint, and as a matter of law, Mr. Choudhry is not liable for copyright

21  infringement with respect to any of the copyright rights that Righthaven alleges have been

22  infringed.

23

24  _____
[7] Framing allows a web site to display more than one HTML document in the same browser

25  window. In the *Perfect 10 v. Amazon* case, Google used framing to present third-party web sites
along with information from Google's web site in the same browser window, and in addition

26  linked inline the full-size images from the third party sites. GupShup did not use framing in this
case, but rather simply linked the image inline. The difference is, for purposes of this case,

27  immaterial: the *Perfect 10 v. Amazon* court found both framing and inline linking to be non-
infringing in this context. *See Perfect 10 v. Amazon*, 508 F.3d at 1159.

28

1

## B.  The HTML Source Code Is Incorporated By Reference Into Righthaven's Complaint.

2

3        When evaluating a motion to dismiss, the Court may take into consideration documents

4   referenced or relied on in the complaint under the "incorporation by reference" doctrine. *See,*

5   *e.g.*, *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 n.4 (9th Cir. 1998), *superseded on other grounds,*

6   *Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676 (9th Cir. 2006) (where a defendant attaches

7   a document to its 12(b)(6) motion that "is integral to the plaintiff's claims and its authenticity is

8   not disputed, the plaintiff 'obviously is on notice of the contents of the document and the need

9   for a chance to refute evidence is greatly diminished."). Such consideration does not convert a

10  Rule 12 motion into a motion for summary judgment. *See Branch v. Tunnell*, 14 F.3d 449, 454

11  (9th Cir. 1994), *overruled on other grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119

12  (9th Cir. 2002); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The purpose of the

13  incorporation by reference doctrine is to prevent "plaintiff from surviving a Rule 12(b)(6) motion

14  by deliberately omitting references to documents upon which their claims are based." *Parrino,*

15  146 F.3d at 706. The Court may treat a document incorporated by reference as part of the

16  complaint, "and thus may assume that its contents are true for purposes of a motion to dismiss

17  under Rule 12(b)(6)." *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

18        Righthaven alleges that a forum post, attached as Exhibit 2 to its Complaint, constitutes

19  the infringement upon which it bases its claim; accordingly, Exhibit 2 forms the basis of

20  Righthaven's claim. The HTML code [Choudhry Decl., Ex. A] in fact *is* Plaintiff's Exhibit 2,

21  albeit in a slightly different form. When a web browser displays a web page, it loads the HTML

22  code into memory, and interprets that code to produce an easily-readable web page. Because the

23  HTML code attached to Mr. Choudhry's Declaration as Exhibit A is the precise code that

24  generated Plaintiff's Exhibit 2, it is incorporated by reference. [Choudhry Decl., ¶¶ 26-27].

25  Righthaven should not be permitted to omit the HTML code from its Complaint, particularly

26  where, as here, it conclusively demonstrates non-infringement.[8] Nor can Righthaven credibly

27  _____

28  [8] The HTML code, [Choudhry Decl., Ex. A], is also a proper subject for judicial notice, pursuant
    to Fed. R. Evid. 201(b).

dispute the authenticity the HTML code: there is no reason to believe it is anything other than authentic, and Righthaven itself must of necessity have already been in possession of the HTML code at the time it created a copy of the forum post for the purposes of creating Exhibit 2 – the code would have been loaded into Righthaven's web browser.

Because the source code demonstrates not only non-liability, but also that amendment would be futile, the Complaint should be dismissed with prejudice. In the event the Court decides that the source code is not incorporated by reference, summary judgment would be appropriate, because there can be no material dispute regarding the fact that the Infographic was linked inline.

## V.   PLAINTIFF HAS NOT ALLEGED, AND CANNOT ALLEGE, A VOLITIONAL ACT, WHICH IS A PREREQUISITE TO A CLAIM FOR DIRECT COPYRIGHT INFRINGEMENT

In order to succeed in its allegations of direct copyright infringement, Righthaven must allege that Defendant committed a volitional act that resulted in a violation of a right in Section 106 of Title 17. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006); *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995). It has not, and it cannot, because the Infographic appeared through an inline link generated by an automated RSS feed published by third party Make. [Choudhry Decl. ¶¶ 29, 31-36].

Subscribing to an RSS feed is not a volitional act for purposes of the Copyright Act, because such posts appear on Mr. Choudhry's site automatically, with no human intervention beyond the initial configuration of the system. *See Netcom*, 907 F. Supp. at 1367 (No infringement where "According to a prearranged pattern established by Netcom's software, Erlich's initial act of posting a message to the Usenet results in the automatic copying of Erlich's message from Klemesrud's computer onto Netcom's computer. . .").[9] *See also, Cartoon Network, 536 F.3d at 131*; *CoStar Group, 373 F.3d at 546.*

---

[9] Usenet is an Internet-based messaging service, to which Netcom subscribed and which closely parallels Mr. Choudhry's conduct in subscribing to Make's RSS feed.

1    That there was no volitional act is plain from the face of Righthaven's Complaint. [Pl.'s

2    Compl., Ex. 2 (title of sub-forum in which allegedly infringing post appeared is "RSS:Gadgets");

3    Choudhry Decl ¶¶ 29, 31-36]. RSS (commonly expanded as "Really Simple Syndication"), is a

4    family of web feed formats used to publish frequently updated works – in this case, blog entries

5    – in a standardized format. *See, e.g.,* Wikipedia, http://en.wikipedia.org/wiki/RSS;

6    http://www.mnot.net/rss/tutorial (last visited Jan. 18, 2011). An RSS feed allows users, including

7    web sites such as GupShup, to "subscribe" to the feed. Such a subscription enables the web site

8    "to receive automatic updates (such as headlines) originating from a third party source. . . . The

9    website receiving the RSS feed will 'call' the originating website automatically." *Diario El Pais,*

10   *S.L. v. Nielsen Co.,* (US), No. 07-CV-11295(HB), 2008 U.S. Dist. LEXIS 92987, at *3 n.1

11   (S.D.N.Y. Nov. 6, 2008); *see also,* Urs Gasser, *Regulating Search Engines: Taking Stock and*

12   *Looking Ahead,* 8 YALE J. L. & TECH. 201, 206 (2006) (noting that RSS feeds are "provided

13   automatically by websites" to search engines). The RSS standard is widely used by blogs and

14   major content providers alike. [Costa Decl., Exs. J, K, L (showing RSS feeds available from

15   several major news providers, including the LVRJ)].

16   RSS feeds typically consist of a snippet of text, followed by a link back to the source for

17   the full content; how much content is included in the feed is the choice of the feed provider. In

18   the feed at issue in this case, Make provided the text of its post, along with hyperlinks to two

19   pictures: the Infographic in which Righthaven claims a copyright, and the homemade "Solar

20   Death Ray" that had been featured in the pages of an earlier issue of Make Magazine. [Choudhry

21   Decl. ¶ 29].

22   Mr. Choudhry subscribed to Make's feed over a year ago. [Id. ¶ 30]. Since that time, the

23   software that runs the GupShup forums, vBulletin, has checked in with Make Magazine, and the

24   other feeds it subscribes to, on a regular and fully automated basis. [Id. ¶ 15]. Since Mr.

25   Choudhry's initial subscription to the feed, through at least the date of the alleged infringement,

26   every post that that Make published through its RSS feed was posted automatically by the

27   vBulletin software in GupShup's RSS:Gadgets sub-forum shortly after Make made it available.

28   Id]. No additional steps were undertaken by Mr. Choudhry, and Mr. Choudhry does not – and

1   cannot – screen the contents of each and every third-party RSS feed that automatically appears

2   on GupShup. [Id. ¶ 37].

3        In *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F. Supp. 1361 (N.D.

4   Cal. 1995), an internet service provider was accused of copyright infringement based on a

5   customer's posting of material to a content service to which Netcom chose to subscribe. Unlike

6   Mr. Choudhry, Netcom stored the allegedly infringing content on its own servers for a period of

7   time. *See id.* at 1367-68. Nevertheless, because the content was transmitted to Netcom's servers

8   automatically via its Usenet subscription, the court held that there could be no infringement as a

9   matter of law because an "element of volition or causation . . . is lacking where a defendant's

10  system is merely used to create a copy by a third party." *Id.* at 1370. The court recognized the

11  important of the volitional act element of copyright infringement is critical in the digital age;

12  without it, copyright law "would create many separate acts of infringement and carried to its

13  natural extreme, would lead to unreasonable liability" which may extend to each and every

14  computer that is necessary for the function of the internet itself. *Id.* at 1369.

15       This Court recognized the volitional act requirement in *Field v. Google, Inc.*, 412 F.

16  Supp. 2d 1106 (D. Nev. 2006), where the plaintiff alleged that Google infringed when it showed

17  users copies of material that were "cached" on its computers – i.e., stored automatically for ease

18  of delivery to those searching for those materials. *See id.* at 1115. The Hon. Robert Jones

19  disagreed, holding that a "plaintiff must also show volitional conduct on the part of the defendant

20  in order to support a finding of direct copyright infringement." *Id.*; *accord Parker v. Google,*

21  *Inc.*, 422 F. Supp. 2d 492, 497 (E.D. Pa. 2006).

22       While the volitional act doctrine is of paramount importance to the existence and function

23  of the internet, it is not a new rule. The Copyright Act has always required volition – as

24  embodied within its protection of the exclusive right "to do" the actions reserved for copyright

25  owners in 17 U.S.C. § 106. Netcom simply applied the well-settled principles of § 106 to the

26  digital age. As such, it has been widely followed.[10]

---

27  [10] *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (concluding "that

28  Netcom made a particularly rational interpretation of § 106 when it concluded that a person had

In *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004), CoStar was a real estate listing service that produced photographs of commercial real estate properties offered by its customers. LoopNet provided a web site that hosted such real estate listings. Some of CoStar's customers also wanted listings on LoopNet, and uploaded CoStar's copyrighted photographs for display on the LoopNet website. *See id.* at 546-47. CoStar sued LoopNet – not the users who instigated the infringement – for copyright infringement. Following *Netcom*, the Fourth Circuit held that "[b]ecause LoopNet, as an Internet service provider, is simply the owner and manager of a system used by others who are violating CoStar's copyrights and is not an actual duplicator itself, it is not directly liable for copyright infringement." *Id.* at 546. As the court went on to explain:

> "To establish direct liability . . . something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.... [A service provider] who owns an electronic facility that responds automatically to users' input is not a direct infringer."

*Id.* at 550. Even if Righthaven could allege generalized knowledge that RSS feeds sometimes contain infringing material – which it has not – that would be insufficient to state a direct liability claim. *See id at* 549; *see also Sega Enters. Ltd. v. Maphia*, 948 F. Supp. 923, 932 (N.D. Cal. 1996) (no direct liability even where the defendant operating the web site knew infringing games were uploaded, and solicited others to upload games).

Mr. Choudhry operates a web site that automatically publishes content produced by third parties. Such conduct does not give rise to direct copyright liability, and no amendment by Righthaven can claim otherwise. *See Netcom*, 907 F. Supp. 1361 (no direct liability even when operator explicitly subscribes to service to which third parties publish infringing content); *see*

to engage in volitional conduct — specifically, the act constituting infringement — to become a direct infringer."); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) (agreeing with *CoStar* that *Netcom* was "particularly rational"); *Marobie-Fl., Inc. v. Nat'l. Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1176-79 (N.D. Ill. 1997) (following *Netcom*); H.R. Rep. No. 105-551(I), at 11 (1998) (Congress describes Netcom as the "leading and most thoughtful judicial decision to date" in the subject of internet liability).

1   *also Sega,* 948 F. Supp. at 1372. Accordingly, Righthaven's sole claim for direct copyright

2   infringement should be dismissed with prejudice. To the extent the Court finds the Complaint

3   alone insufficient to demonstrate this point conclusively, summary judgment is appropriate

4   because the fact that the post was published automatically by RSS is not reasonably subject to

5   dispute, and demonstrates as a matter of law that Mr. Choudhry did not engage in any volitional

6   act related to the alleged infringement. [Choudhry Decl. ¶¶ 15, 29-38].

## VI.   IT WOULD BE FUTILE FOR RIGHTHAVEN TO ATTEMPT TO AMEND ITS COMPLAINT

As shown above, Righthaven cannot allege any successful theory of direct infringement.

However, Defendant anticipates that in light of the *Perfect* 10 case, Righthaven might attempt to

amend its Complaint to allege indirect or "secondary" copyright liability. To do so would be

futile. The Complaint on its face demonstrates conclusively that such theories are unavailable to

Righthaven in this circumstance.

A defendant is liable for contributory infringement when it, "with knowledge of the

infringing activity, induces, causes or materially contributes to the infringing conduct of

another." *Perfect 10 v. Amazon*, 508 F.3d at 1171 (*citing Gershwin Publ'g Corp. v. Columbia

Artists Mgmt, Inc*., 443 F.2d 1159, 1162 (2d Cir. 1971). Aside from the fact that Mr. Choudhry

cannot be held to have "materially contributed" to any infringement merely because he made a

link to the Infographic available to a handful of people, *see, e.g., Perfect 10, Inv. V. Visa Int'l

Serv. Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007),  Righthaven cannot as a matter of law allege the

knowledge element. This is particularly true now that Righthaven is on notice, by virtue of the

instant motion, that the post appeared automatically by virtue of his subscription to Make's RSS

feed. Because of the way RSS works, the content at issue must have appeared (and in fact did

appear) on Mr. Choudhry's web site automatically, without any intervention by Mr. Choudhry

beyond subscribing to the feed over one year prior to the alleged infringement. [Choudhry Decl.

¶¶ 15, 29-38]. Accordingly, he could not have known that the allegedly infringing post would

1    appear on his web site until after the post arrived.[11] Because of the automated nature of RSS, it

2    would be futile for Righthaven to attempt to allege the knowledge element of contributory

3    liability.

4         A defendant is liable for vicarious infringement when it derives a direct financial benefit

5    from the direct infringement, and "has both a legal right to stop or limit the directly infringing

6    conduct, as well as the practical ability to do so." *Perfect 10 v. Amazon*, 508 F.3d at 1173. Mr.

7    Choudhry has derived no financial benefit from Make's posting of the Infographic, much less a

8    "direct" financial benefit. [Choudhry Decl. ¶¶ 39-40]. Even if he had, Righthaven cannot allege

9    that he has any right or ability to control the contents of the RSS feed published by third party

10   Make. [Id. ¶¶ 41-44]. Mr. Choudhry is not affiliated in any way with Make, other than as a

11   passive recipient of its RSS feed, [Id.], and Righthaven cannot allege any such affiliation.

12   Similarly, Mr. Choudhry has no right or ability to control what Make Magazine decides to

13   publish or store on its servers. [*Id*. ¶¶ 42-44]; *Perfect 10 v. Amazon*, 508 F.3d at 1174 (Even

14   though Google can affect the infringement of third parties to some degree by virtue of its control

15   over its own search results, as a matter of law that does not constitute "the practical ability to

16   police the infringing activities of third-party websites"); *Perfect 10 v. Visa*, 494 F.3d at 803 (even

17   the power to exert an indirect effect that would reduce infringing activity does not constitute

18   "right and ability to control").

19        "Amendment under the Federal Rules of Civil Procedure should be granted 'unless

20   amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or

21   creates undue delay.'" *Yakama Indian Nation v. Wash. Dept. of Revenue*, 176 F. 3d 1241, 1246

22   (9th Cir. 1999). Futility "includes the inevitability of a claim's defeat on summary judgment."

23   *Johnson v. American Airlines, Inc*., 834 F.2d 721, 724 (9th Cir. 1987); *see also*, *Gabrielson v.*

24   *Montgomery Ward & Co*., 785 F.2d 762, 766 (9th Cir.1986) ("any amendment would have been

25   futile in that it could be defeated on a motion for summary judgment"); *Roth v. Garcia Marquez*,

26

27   [11] In fact, Mr. Choudhry did not find out that there was any alleged infringement at all until he
     was contacted by a newspaper reporter seeking comment on the instant litigation, of which Mr.
28   Choudhry was also unaware at the time. [Choudhry Decl. ¶¶ 23,24].

942 F.2d 617, 628 (9th Cir. 1991). For the reasons discussed above, it would be futile for Righthaven to amend its complaint to allege contributory or vicarious liability, because – at a minimum – Righthaven cannot seriously dispute Mr. Choudhry's lack of knowledge or the fact that he lacks the right and ability to control Make. Both are a natural consequence of the automated RSS feed that caused the post to appear on the GupShup site.

## VII.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE, AS A MATTER OF LAW, THE USE ALLEGED IS A FAIR USE

Even if Mr. Choudhry had copied the Infographic to his server (which he did not), and even if Mr. Choudhry had engaged in a volitional act related to the alleged infringement (which he did not), Righthaven's sole cause of action for copyright infringement is barred as a matter of law by the fair use doctrine. 17 U.S.C. § 107 lists four factors to be considered in determining whether a given use is a fair use: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. These factors are to be explored and weighed together in light of the purposes of copyright when evaluating fair use. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). In this case, each of the factors weighs strongly in favor of fair use.[12]

### A.   The Purpose And Character Of The Use

Most important to the Court's analysis of the first factor is whether the use was "transformative." Transformative uses weigh strongly in favor of fair use. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (online search engine's use of thumbnail-sized images was transformative); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (book publisher's use of reduced-sized images of concert posters and tickets as historical artifacts in Grateful Dead biography was transformative); *Blanch v. Koons*, 467 F.3d 244, 252-53 (2d Cir. 2006) (artist's use of plaintiff's photograph of legs and feet in Pop

---

[12] For the purposes of this section only, Mr. Choudhry assumes *arguendo* that use of a copyrighted work has occurred.

1   Art collage served a transformative artistic purpose). It is not necessary for the underlying work

2   to be changed in order for a use to be transformative; rather the relevant inquiry is directed to the

3   way in which the work was used. *See, e.g., Perfect 10 v. Amazon*, 508 F.3d at 1165 ("even

4   making an exact copy of a work may be transformative so long as the copy serves a different

5   function than the original work.")

6          In evaluating whether a work is transformative, courts consider "whether the new work

7   merely supersedes the objects of the original creation, or instead adds something new, with a

8   further purpose or different character, altering the first with new expression, meaning, or

9   message." *Campbell*, 510 U.S. at 579. The post in question, which has been attached to the

10  Complaint as Exhibit 2, uses the Infographic in a transformative way: as an educational example

11  in conjunction with other materials designed to educate readers on the properties of solar "death

12  rays." Make's blog post juxtaposes the Vdara death ray with a photograph of a homemade solar

13  death ray, along with Wired's description of the optical and mathematical properties of curved

14  surfaces (like the Vdara), in the interest of educating users about an exciting optical

15  phenomenon, and teaching them how to build (or, if necessary, avoid building) a death ray of

16  their very own. [Pl.'s Compl., Ex 2. (transformative blog post)]. This juxtaposition, and the

17  informative purpose to which it was put, "adds something new, with a further purpose or

18  different character," and alters the meaning of the Infographic with new expression, new

19  meaning, and a new message. *Campbell*, 510 U.S. at 579.

20         The LVRJ published the Infographic alongside an article and various photographs to

21  provide timely, generalized information to Las Vegas residents about events in their local

22  community – and perhaps to warn readers to avoid the Vdara hotel on sunny days. The Make

23  blog post was intended to addresses a much different audience – technology-oriented DIY

24  enthusiasts throughout the United States and abroad, who would benefit from learning about the

25  engineering and optical principles of curved surfaces that focus the Sun's rays. The intended

26  audience of GupShup's RSS:Gadgets forum is also those interested in technology issues, nearly

27  half of whom reside in the nations of Pakistan and India. [Choudhry Decl. ¶ 12]. The fact that

28  very different audiences were involved also supports the transformative nature of the work. *See*

1    *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984) (societal benefits are

2    found in expanding public access to freely available information); *Field*, 412 F. Supp. 2d at 1119

3    (finding fair use where Google's cache of works served "different and socially important

4    purposes" than the original works); *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22-23

5    (1st Cir. 2000) (where photos that originally appeared in model's portfolio were distributed by a

6    newspaper in the interest of informing the public about controversy, informative nature of the

7    new use weighed in favor of newspaper); *Bill Graham*, 448 F.3d at 609 (where posters were

8    originally used to generate interest in, and convey information about, Grateful Dead's concerts,

9    educational nature of their new use in a book about the band weighed in favor of fair use).

10         The first factor may also consider "whether the original was copied in good faith to

11   benefit the public or primarily for the commercial interests of the infringer." *Am. Geophysical*

12   *Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994). Not only is this a clear case of "public

13   benefit," but because the use was highly transformative, any potential commercial character

14   fades in significance. *See Campbell*, 510 U.S. at 579; *Perfect 10 v. Amazon*, 508 F.3d at 1166.

15   Mr. Choudhry made no effort to commercially exploit the Infographic. Although a trivial amount

16   of revenue could have been generated from the post (perhaps as much as a few pennies), it

17   stemmed from the fact that all forums on the web site contain advertising. Finally, "The crux of

18   the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but

19   whether the user stands to profit . . . without paying the customary price." *Harper & Row,*

20   *Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985). The customary price of the work is free.

21   [Costa Decl, Ex. E]. Because the use was transformative and of limited or no commercial

22   character, there can be no legitimate dispute that this factor weighs strongly in favor of fair use.

23         **B.    The Nature Of The Work**

24         Creative and expressive works are generally entitled to stronger copyright protection than

25   those works that are purely factual or scientific in nature. The nature of the Infographic (as well

26   as the article it accompanies) is purely factual in nature: it presents a factual and scientific

27   account of the interaction between the Vdara Hotel and the Sun's rays. [*See* Pl.'s Compl., Ex. 1

28   (describing the specific side of the building struck by the Sun, and the resulting 10-15 foot

1   diameter area created thereby)]. Courts have recognized a greater public need for the

2   dissemination of factual works than works of fiction or fancy, as well as the greater degree of

3   creativity that typically inheres in the latter. *See L.A. News Serv. v. CBS Broad. Inc*., 305 F.3d

4   924, 940 (9th Cir. 2002) (internal citations omitted).

5   　　　In addition to being a factual work, the work is at best minimally creative. Most of the

6   Infographic is comprised of an illustration of the Vdara Hotel – a design not created by the

7   Infographic's illustrator, but rather by the architect of the Vdara itself. [Costa Decl. Exs. M, N, O

8   (examples of copyrighted architectural renderings of the Vdara and its pool area, that are

9   substantially similar to the Infographic's rendering of the Vdara)]. To the extent the Infographic

10  constitutes an infringing derivative work of the Vdara, or photographs or renderings thereof, it is

11  not copyrightable. *See Sobhani v. @radical.media, Inc*., 257 F. Supp. 2d 1234, 1238 (C.D. Cal.

12  2003) (". . . if a work is derived from a previous work, and the new work thereby infringes a

13  copyright in the previous work, then the new work is an unauthorized (and infringing) derivative

14  work."); *Anderson v. Stallone*, 1989 U.S. Dist. LEXIS 11109, at *25 (C.D. Cal. April 26, 1989)

15  (no copyright protection available to infringing derivative works). In this case, the LVRJ's use of

16  the Vdara in its illustration was likely a fair use (and therefore non-infringing).[13] Yet even when

17  a derivative work is non-infringing, copyright in such a work "extends only to the material

18  contributed by the author," 17 U.S.C. § 103(b), and only to the extent such contribution is more

19  than trivial, *see Entm't Research Group v. Genesis Creative Group*, 122 F.3d 1211, 1218-1219

20  (9th Cir. 1997). Perhaps this is why, in Righthaven's application for copyright registration in the

21  Infographic, it claimed copyright in only the "text" of the work. [Pl.'s Compl., Ex. 3].

22  　　　The doctrines of merger and *scenes a faire* reinforce the conclusion that Righthaven's

23  copyright in the Infographic is, if it exists at all, extremely thin. Copyright law protects only an

24  author's expression of an idea; not the idea itself. *See* 17 U.S.C. § 102(b); *Mazer v. Stein*, 347

25  U.S. 201, 217-218 (1954). The merger doctrine holds that where the idea underlying a work can

26

27  [13] It is ironic that the very doctrine that may afford Righthaven the ability to obtain the benefit of some, albeit minimal, copyright protection in the Infographic, is one that Righthaven will no doubt argue is inapplicable to Mr. Choudhry's use of the same Infographic.

28

1    only be expressed in a narrow range of ways – particularly in the case of factual works – the idea

2    and expression "merge." *See, e.g., Landsberg v. Scrabble Crossword Game Players, Inc.*, 736

3    F.2d 485, 488 (1984); *Ets-Hokin v. Skyy Spirits*, 225 F.3d 1068, 1082 (2000). Under the related

4    doctrine of *scenes a faire,* "courts will not protect a copyrighted work from infringement if the

5    expression embodied in the work necessarily flows from a commonplace idea." *Ets-Hokin*, 225

6    F.3d 1068 at 1082.

7         There are very few ways to illustrate the Sun's reflection off the Vdara and into its pool

8    area. Every illustration of the Vdara death ray must, of necessity, include: (1) the Vdara; (2) its

9    pool area; (3) a beam of sunlight; (4) traveling at the precise angle required to be reflected into

10   the pool area; and (5) some factual text. The idea of placing all of these elements together to

11   describe the Vdara death ray is not copyrightable, nor are the facts that the elements represent.

12   Given that the death ray reflects off the south side of the Vdara at a particular angle and into its

13   pool area, any minimal degree of creativity involved in representing those facts is merged with

14   the underlying facts. Similarly, because any minimal degree of original expression embodied in

15   the work flows necessarily from the commonplace idea of an infographic illustrating the Vdara

16   death ray, the doctrine of *scenes a faire* also suggests that the work is so factual in nature as to

17   have, at best, extremely thin copyright protection.

18        Just as the drawing itself is so factual and derivative as to be not (or at the very best,

19   barely) copyrightable, neither is the text that appears therein. The Infographic's text consists of:

20   (a) "Sunlight" (identifying the arrow); (b) "South side of property;" (c) "The solar reflection

21   covers an approximate 10 foot by 15 foot area, which moves as the Earth rotates;" and (d) "Pool

22   area." [Complaint, Ex. 1]. These labels are pure fact. *See Feist Publ'ns, Inc. v. Rural Tel. Serv.*

23   *Co.*, 499 U.S. 340, 344 (1991) (facts are not copyrightable). To the extent the text is anything

24   other than pure fact, any minimal degree of creativity must merge with the underlying ideas.

25        The Infographic is a published, factual work that is entitled to, at best, extremely narrow

26   copyright protection. This factor strongly supports fair use.

27

28

### C.   Amount And Substantiality Of The Portion Used

Righthaven's Complaint makes clear the amount of the work that was used – very little. Based on the size of the image represented in Exhibit 1 to the Complaint as Righthaven's copyrighted illustration, and the size of the image represented in Exhibit 2 as the allegedly infringing work, the Make post is a substantially reduced-size version. In particular, Plaintiff's work is an image measuring approximately 5.25 inches wide by 9 inches high (area = 47.25 square inches). [Pl.'s Compl., Ex. 1.]. Defendants' image is approximately 3.5 inches wide by 4 inches high (area = 14 square inches). [Pl.'s Compl., Ex. 2.]. Accordingly, taking everything in Righthaven's Complaint as true, Defendants' image is a approximately 30% the size of Plaintiff's original work. In addition, Defendants' image omits the image title "Death Ray' heats up Vdara guests, residents."

The use of reduced-size images (or, "thumbnails") has routinely been endorsed by courts in fair use cases as an important factor weighing in favor of fair use. *See, e.g.*, *Kelly*, 336 F.3d at 818-20 (online search engine's use of thumbnail-sized images was fair use); *Bill Graham Archives v. Dorling Kindersly*, 448 F.3d 605, 613 (2d Cir. 2006) (even though images were copied in their entirety, factors such as reduced size, and juxtaposition with other related material weighed in favor of fair use). Further, in evaluating the third fair use factor, it is appropriate to consider only the amount and substantiality of *protectable* expression that has been used. *See, e.g., Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) ("The nine-pointed figure, the labels and their sequence, taken separately, are non-copyrightable. We need consider only Ichazo's creative decision to link the labels with the figure.").

Finally, the third factor counsels courts to look not only at the mere percentage of the work used, but also at why the defendant used as much of the work as it did. *See, e.g., Campbell,* 510 U.S. at 588-89 (for parody to be effective, it must take enough material to evoke the original); *Kelly*, 336 F.3d at 821 ("[i]t was necessary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information. . ."); *Nuñez*, 235 F.3d at 24 ("to copy any less than [the entire picture] would have made the picture useless to the story."); *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118

(9th Cir. 2000) (noting that, in *Sony*, copying the entire work was appropriate because viewers had been invited to watch the television programs "in [their] entirety free of charge."). In the case of Mr. Choudhry and Make Magazine, even if 100% of the image were protectable, even if 100% had been used, and even if were at full size (which, according to the Complaint, it was not), such a use would have been necessary to convey Make's solar death ray message to readers.

Make used only as much of the image as was necessary to educate readers about solar death rays generally, and the Vdara death ray in particular. Make did not include the picture's title, because the title was not necessary to convey the information. However, the pictorial elements, including the illustration of the building, the line showing the path of sunlight onto the building and the angle of its reflection into the pool area, and the text showing the size of the heated area created by the sun is similarly, were indispensible to describing the optical properties of the Vdara. Without each of those elements, the illustration would have been meaningless to Make Magazine's audience.

Because the Infographic comprises only a small percentage of the work claimed to have been infringed by Plaintiff Righthaven, and because Make Magazine used a reasonable amount of the work to illustrate the properties of solar death rays, this factor weighs strongly in favor of a finding of fair use.

### D.    Effect On The Market For Or Value Of The Copyrighted Work

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In evaluating this factor, courts consider the extent of market harm caused by the particular actions of the alleged infringer, as well as "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original.'" *Kelly,* 336 F.3d at 821 (quoting 3 Nimmer on Copyright § 13.05[A][4] (1993)). A transformative work is less likely still to have an adverse impact. *See id.*

In this case, there is no effect on the potential "market" for the copyrighted work, because – at least with respect to Righthaven – there is no market for the work whatsoever. Righthaven does not operate a newspaper or otherwise profit from the Infographic, outside of its dubious

1  business model, which actually benefits from more, not less, infringement.[14] Righthaven has not

2  alleged, other than in the most conclusory fashion, that it was harmed, and it can never do so,

3  because Righthaven exists solely for the purpose of filing copyright infringement actions. [*See*

4  Costa Decl., Ex. A (Righthaven is a "technology company whose only job is to protect

5  copyrighted content."]. Such litigation-focused conduct as a matter of law deprives Righthaven

6  of the argument that the market value of its work has been harmed. *See Video-Cinema Films,*

7  *Inc. v. CNN, Inc.*, 2001 U.S. Dist. Lexis 25687, at *32 (S.D.N.Y. Nov. 28, 2001) (finding no

8  market harm when only payments were settlements to avoid litigation); *Field*, 412 F. Supp. 2d at

9  1121 (fourth factor supported fair use where there was no evidence of any market for plaintiff's

10  made-for-litigation writings).[15]

11          Even before the LVRJ purported to have assigned its copyright to Righthaven, the post

12  would not have harmed the market for the work. The LVRJ elected to give the Infographic away

13  for free on the Internet – without advertisements – and continues to do so to this day. [Costa

14  Decl., Ex. E (http://media.lvrj.com/images/4822896-4-4.jpg).] Given this fact, it is difficult to

15  imagine that the LVRJ could have been harmed by the limited and transformative nature of

16  GupShup's use. Even if the LVRJ had been deprived of a few pennies in revenue as a result of

17  diverted traffic (actually, the contrary is most likely given that the article was not copied, and

18  was linked to, in the post), the law does not concern itself with such trifles. *See Sony*, 464 U.S. at

19  451 n.34 (noting the "partial marriage between the doctrine of fair use and the legal maxim *de*

20

21  [14] Were Righthaven to eliminate the sorts of uses it here takes issue with, it would presumably cripple its ability to go forward and market its "service" to third parties.

22  [15] In *Righthaven v. Realty One Group*, Case No. 10-1036-LRH-PAL, Righthaven argued that the market harm factor is not plaintiff-specific. *See id.*, Dkt. 12 at 14 n.7. That is incorrect. In fair

23  use cases, courts look to the effect the use will have on the copyright owner's market for the work. *See Mattel v. Walking Mountain*, 353 F.3d 792, 805 (9th Cir. 2003) (examining "the

24  personal gain the copyright owner will receive if the use is denied.") (citation and internal quotation omitted); *accord Sony*, 464 U.S. at 450 (examining whether the use would "impair the

25  copyright holder's ability to obtain the rewards that Congress intended him to have.");*Kelly*, 336 F. 3d at821 ("Arriba's use of Kelly's images also would not harm Kelly's ability to sell or

26  license his full-sized images."). This Court subsequently granted the motion to dismiss in *Realty*

27  *One* on fair use grounds. *See Righthaven LLC v. Realty One Group, Inc.*, Case No. 10-1036, 2010 U.S. Dist. LEXIS 111576 (D. Nev. Oct. 19, 2010).

28

*minim[i]s non curat lex*" when the use does not harm the copyright owner) (internal quotations omitted).

Would "unrestricted and widespread conduct" of the sort engaged in by Mr. Choudhry result in adverse impact on the "market" for Righthaven's Infographic? Certainly not. Mr. Choudhry did nothing more than subscribe to an RSS feed – over a year ago – from a blog that he believed his visitors would enjoy keeping up with. [Choudhry Decl. ¶¶ 14, 15, 30]. He wanted to share regular updates from Make Magazine with his forum community, and never in his wildest dreams imagined that he would later be sued for infringing an image he never copied, and which appeared on his site automatically. [*Id.* ¶¶ 14, 15]. This factor strongly supports fair use.

Even if Mr. Choudhry had copied the work, rather than merely linking to it, and even if such copying had been volitional, rather than automatic – each of the four factors, and the factors taken as a whole, overwhelming weigh in favor of fair use. Although fair use is generally a mixed question of law and fact, in this case the facts supporting a finding of fair use are apparent on the face of Righthaven's Complaint. [Pl. Compl., Exs. 1, 2]. *See also, Righthaven LLC v. Realty One Group, Inc.*, Case No. 10-1036, 2010 U.S. Dist. LEXIS 111576 (D. Nev. Oct. 19, 2010) (dismissing Righthaven's claim for infringement of a newspaper article on fair use grounds). To the extent that it is necessary for the Court to go beyond the pleadings (for example, with respect to the fact that Righthaven does not publish a newspaper, or with respect to other facts the Court may find material), such facts are not subject to reasonable dispute, and summary judgment would be appropriate.

## VIII.   RIGHTHAVEN'S DEMAND FOR DOMAIN NAME TRANSFER SHOULD BE DISMISSED

The Court should categorically reject Plaintiff Righthaven's *in terrorem* request for an order requiring "GoDaddy, and any successor domain name registrar for the Domain, to lock the Domain and transfer control of the Domain to Righthaven." [Prayer for Relief, ¶ 3].[16]

---

[16] The Complaint defines the Domain as paklinks.com. [Pl.'s Compl. ¶ 6]. To the extent Righthaven's Complaint could be construed as requesting a similar order regarding the pak.org domain, that request should be dismissed as well.

1  Righthaven has included such a demand for transfer as a matter of course in its stream of

2  copyright infringement lawsuits, apparently intending to scare operators of web sites who fear

3  losing one of their most critical assets. Such relief is unavailable as a matter of law, because (1)

4  the Copyright Act does not authorize domain transfer; (2) Rule 65 prohibits entry of an order

5  purporting to bind the non-party registrar of Mr. Choudhry's domain; and (3) an order

6  transferring the Domain to Righthaven would violate the First Amendment.

7  **A.  The Copyright Act Does Not Authorize Domain Name Transfer.**

8  The remedies available to a plaintiff in a copyright infringement action "are only those

9  prescribed by Congress." *Sony*, 464 U.S. at 431 (quoting *Thompson v. Hubbard*, 131 U.S. 123,

10  151 (1889)), and they do not include transfer of domain names. *See* 17 U.S.C. § 501 *et seq*.

11  Indeed, courts routinely reject plaintiffs' attempts to seek remedies beyond the Copyright Act.

12  *See Sony*, 464 U.S. at 431 ("The judiciary's reluctance to expand the protections afforded by the

13  copyright without explicit legislative guidance is a recurring theme."); *Nintendo of Am., Inc. v.*

14  *Aeropower, Co.*, 34 F.3d 246, 251 (4th Cir. 1994) (improper to award trebled statutory damages

15  for copyright infringement because the Copyright Act "provides the exclusive remedies for

16  copyright infringement and it contains no provision for trebling statutory damages"); *Budget*

17  *Cinema, Inc. v. Watertower Associates*, 81 F.3d 729, 733 (7th Cir. 1996) (same); *Mulberry Thai*

18  *Silks, Inc. v. K&K Neckwear, Inc.*, 897 F. Supp. 789, 792 (S.D.N.Y. 1995) (same).

19  17 U.S.C. § 502 authorizes injunctive relief only "on such terms as [a court] may deem

20  reasonable *to prevent or restrain infringement of a copyright*."  (emphasis added). But Section

21  502 is limited to injunctions that target specific infringing activities; a domain name has no

22  nexus whatsoever with an infringing post that may appear somewhere within that domain.

23  Popular web sites such as the New York Times, Amazon and Yahoo! have each faced copyright

24  infringement allegations in the past; it would be absurd to suggest that a plaintiff alleging

25  copyright infringement against one of those companies would be entitled to its domain name –

26  even if that plaintiff prevailed. As a site that hosts a sizable community and millions of posts,

27  GupShup is no different. Indeed, Righthaven has now admitted, in a separate lawsuit before this

28

Court, that "such relief is not authorized under the Copyright Act." *Righthaven LLC v. DiBiase*, Case No. 2:10-cv-01434-RLH-PAL, Dkt 29 at 5:26-27.[17]

### B.   Rule 65 Prohibits The Court From Ordering A Non-Party To Transfer The Domain.

In an attempt to justify its improper Prayer, Righthaven has argued in the *DiBiase* matter that even though the Copyright Act does not authorize transfer of a domain name as a remedy, the Court may nevertheless order a third party, the registrar GoDaddy, to transfer the domain name as part of its "general equitable powers," Id. at 6-7. Yet GoDaddy is not a party to this action.[18] Pursuant to Rule 65(d)(2), injunctions may only bind: (a) the parties; (b) the parties' officers, agents, servants, employees, and attorneys; and (c) other persons who are in active concert or participation with the parties or their agents. Fed. R. Civ. P. 65(d)(2).The Complaint does not, and cannot, allege that GoDaddy is in "concert or participation" with Mr. Choudhry; it is merely the registrar of his domain name. [Choudhry Decl. ¶ 45]. Courts may not issue binding injunctive relief against individuals or entities not identified by Rule 65(d)(2). *See, e.g., Med. Mut. Ins. Co. of Maine v. Indian Harbor Ins. Co.*, 583 F.3d 57, 64 (1st Cir. 2009) (because none of the defendant companies' directors or officers were named as a defendant, plaintiff's complaint could not be "an effective vehicle for making a demand for relief against them"); *Bobolas v. Does 1-100*, No. CV-10-2056-PHX-DGC, 010 U.S. Dist. LEXIS 110856, at *6 (D. Ariz. Oct. 1, 2010) (the district court lacks power to enter an injunction against non-party webhost and domain name registrar).

---

[17] In this case, such an injunction would be moot in any event, because the allegedly infringing post has already been removed. *See Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1154- 55 (N.D. Cal. 2008) (claim for injunctive relief in copyright action mooted by online web site's prior removal of content from its service).

[18] It is contrary to ancient and "well-settled principles of equity procedure to include parties in an injunction in a suit in which they [are] not heard or represented . . ." *Scott v. Donald*, 165 U.S. 107, 117 (1897); *see also Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945); *Chase Nat'l Bank v. Norwalk*, 291 U.S. 431, 437 (1934).

### C.   An Order Transferring The Domain To Righthaven Would Violate Mr. Choudhry's First Amendment Right To Free Speech.

Finally, a court may not enter an order that would violate the First Amendment. A domain name itself represents protected speech. *See Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("The rooftops of our past have evolved into the internet domain names of our present . . . the domain name is a type of public expression, no different in scope than a billboard or a pulpit . . ."). If Righthaven wants to restrain that speech, it must allege facts demonstrating that the domain name outside of the First Amendment's protections. *See*, *e.g.*, *Jefferson Cty. Sch. Dist. v. Moody's Investor's Servs.*, 175 F.3d 848, 860-61 (10th Cir. 1999) (affirming dismissal of complaint failed to plead any facts that would overcome First Amendment protection). Righthaven has not done so, because it cannot do so.

Righthaven has alleged infringement of a single image in a single forum post, among nearly 8 million posts that are available on Mr. Choudhry's web site. There is no legal support for the proposition that merely because one infringement occurred on paklinks.com, Righthaven should be entitled forever to control the domain. An order transferring the paklinks.com domain would impact the entirety of Mr. Choudhry's web site, not just the vanishingly small amount of content about which Righthaven complains. If the paklinks.com domain were transferred, Righthaven would be in charge of whether the public could view the GupShup forums or participate in the community's discussion. Indeed, Righthaven could put whatever it wanted on the domain, thereby limiting the public's access to Mr. Choudhry's speech.

The Constitution does not permit Righthaven to force GupShup to use a different domain name to convey the same information. The Supreme Court has repeatedly held that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 879-80 (1997) (rejecting argument that content-based restriction was permissible because the law allowed a "reasonable opportunity for speech to occur elsewhere on the Internet); *see also*, *Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976) ("We are aware of no

1    general principle that the freedom of speech may be abridged when the speaker's listeners could

2    come by his message by some other means. . .").

3         An order transferring the domain would also impair the First Amendment rights of

4    GupShup's visitors as well. The First Amendment includes the right to receive ideas. *See Bd. Of*

5    *Educ. V. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas is a necessary predicate to

6    the recipient's meaningful exercise of his own rights of speech, press, and political freedom."

7    GupShup is home to a vibrant community of people from all around the world, who are aware of,

8    and who come directly to, paklinks.com in large numbers to talk about their lives, their religion,

9    political matters, and many other topics. [Choudhry Decl. ¶¶ 6-12]. These and other internet

10   users access paklinks.com by (1) typing the domain name directly into a browser; (2) selecting a

11   bookmark in a browser; (3) using an internet search engine; or (4) following a hyperlink from

12   another web page. Each of these methods would be compromised if the domain were transferred

13   to Righthaven; users would assume that GupShup was no longer being maintained or operated,

14   and their ability to access the speech therein would be sharply curtailed.

15        Depriving Mr. Choudhry of a domain name that he has owned and operated as the home

16   of GupShup since 1994 – in particular as a remedy for one allegedly infringing forum post –

17   would clearly violate the First Amendment's requirement that remedies be narrowly tailored to

18   the harm alleged. *See, e.g.*, *Tory v. Cochran*, 544 U.S. 734, 738 (2005) ("An 'order' issued in

19   'the area of First Amendment rights' must be 'precis[e]' and narrowly 'tailored' to achieve the

20   'pin-pointed objective' of the 'needs of the case'") (quoting *Carroll v. President and Comm'rs of*

21   *Princess Anne*, 393 U.S. 175, 183-84 (1968)). Transferring the domain to prevent unspecified

22   future infringement would amount to an impermissible prior restraint. *See, e.g., Netcom*, 923 F.

23   Supp. 1231, 1259 (N. D. Cal. 1995 ("While a specifically-tailored injunction in a copyright case

24   does not offend the First Amendment, attempting to shut down a critic's speech activities,

25   including those that do not implicate the copyright laws in the least, would constitute an

26   unwarranted prior restraint on speech."); *Ctr. For Democracy & Tech v. Pappert*, 337 F. Supp.

27   2d 606, 651 (E.D. Pa 2004 (statute requiring blocking of access to particular domain named

28   amounted to unconstitutional prior restraint); *Religious Tech. Ctr. v. Lerma*, 897 F. Supp. 260,

263 (E.D. Va. 1995 ("If a threat to national security was insufficient to warrant a prior restraint in *New York Times Co. v. United States*, the threat to plaintiff's copyrights and trade secrets is woefully inadequate.").

Righthaven's demand for domain name transfer amounts to nothing more than an attempt to intimidate ill-informed defendants who are not aware that Righthaven's "leverage" over them is no more than smoke and mirrors. It should be dismissed as a matter of law.

## IX.    CONCLUSION

Regardless of whether Righthaven's litigation tactics amount to an abuse of the legal process [Costa Decl., Ex. P], or whether Righthaven is instead a savior of the newspaper business to be celebrated for its chutzpah [Id., Ex. A], the instant case is one never should have been brought. For the reasons set forth above, Defendants respectfully request that the Court dismiss Righthaven's Complaint in its entirety without leave to amend, or in the alternative enter judgment on the pleadings or summary judgment in favor of Defendants.

Dated: January 18, 2011                                     Respectfully submitted,

                                                            RIDDER, COSTA & JOHNSTONE LLP

                                                            By: /s/ Chris Ridder
                                                            Chris K. Ridder
                                                            CA State Bar Number: 218691
                                                            (*pro hac vice* pending; will comply with
                                                            LR IA 10-2 within 45 days)

                                                            12 Geary Street
                                                            Suite 701
                                                            San Francisco, CA 94108

                                                            CHAD A. BOWERS, LTD.

                                                            By: /s/ Chad Bowers
                                                            Chad A. Bowers
                                                            NV State Bar Number 7283
                                                            3202 W. Charleston Blvd.
                                                            Las Vegas, Nevada 89102

                                                            *Attorneys For Defendant and*
                                                            *Counterclaimant Azkar Choudhry and*
                                                            *Defendant Pak.org*